# 25-1092-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

WANDA BAEZ, SIIDE GIL- FREDERICK, DANIELLE JOHNSON, and
RESIDENTS TO PRESERVE PUBLIC HOUSING,

*Plaintiffs-Appellants*,

---v.---

NEW YORK STATE OFFICE OF TEMPORARY AND DISABILITY
ASSISTANCE, and NEW YORK CITY HOUSING AUTHORITY and
BARBARA C. GUINN, in her individual capacity,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF PLAINTIFFS-APPELLANTS WANDA BAEZ, SIIDE GIL-FREDERICK, DANIELLE JOHNSON, and RESIDENTS TO PRESERVE PUBLIC HOUSING**

LINCOLN SQUARE LEGAL SERVICES
*Attorneys for Appellant-Plaintiffs*
150 W 62nd Street, 9th Floor
New York, NY 10022
(212) 636-6934

*Of Counsel*
Norrinda Brown

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Residents to Preserve Public Housing, by and through its undersigned counsel, hereby certifies that it is a 501(c)(3) corporation, has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

s/ Norrinda Brown_____
Norrinda Brown
LINCOLN SQUARE LEGAL SERVICES
*Attorneys for Appellant-Plaintiffs*
150 W 62nd Street, 9th Floor

New York, NY 10022
(212) 636-6934

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

JURISDICTIONAL STATEMENT ..............................................................7

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................8

STATEMENT OF THE CASE.....................................................................8

    I.    Factual Background ......................................................................9

        A.    NYCHA Residents and the COVID-19 Pandemic ...................................9

        B.    Discriminatory Distribution of Federal Emergency Rental Assistance in New York City. ...............................................................................10

        C.    Plaintiff-Appellants' Causes of Action and Defendant-Appellees' Unlawful Conduct ...........................................................................13

    II.    Procedural History.......................................................................16

        A.    The Complaint and Motion for Class Certification...............................16

        B.    The District Court's Dismissal of the Action ......................................17

ARGUMENT .......................................................................................21

    III.    The Harm Suffered by Plaintiffs is Directly Traceable to OTDA and Commissioner Guinn.....................................................................21

        A.    OTDA and Commissioner Guinn's Publication of Discriminatory Statements Is a Cognizable Harm Redressable by Law. ..............................22

B.      OTDA and Commissioner Guinn's Delay in Distributing ERAP Funds Caused Emotional Distress to Plaintiffs. ........................................................25

IV.    The District Court Erred in Finding that Commissioner Guinn Enjoyed Qualified Immunity ...........................................................................................26

    A.      Commissioner Guinn Is Not Entitled to Qualified Immunity Because Acting Under State Law Does Not Exempt an Official from Responsibility for Discrimination.........................................................................................26

    B.      Commissioner Guinn Is Not Entitled to Qualified Immunity Because She Was Not Enforcing a Presumptively Valid Statute by Violating Clearly Established Antidiscrimination Laws. .............................................27

V.    Plaintiffs' Claims Against OTDA Under Title VI and FHA Are Not Barred by Sovereign Immunity .........................................................................33

VI.    Plaintiffs Have Constitutional Standing Because They Suffered from Concrete and Particularized Injury and Their Requested Relief Is Not Speculative.................................................................................................37

VII.   Plaintiffs Have Standing Because Each Suffered Concrete Injuries .........38

    A.    The Individually Named Plaintiffs Were Harmed by the Discriminatory Application Process Itself and Thus Have Standing........................................39

B.      Johnson Did Not Need to Apply for ERAP Benefits in Order to Have Standing.................................................................................................41

C.      RPPH Has Organizational Standing to Bring Claims. ...........................42

VIII.   Plaintiffs' Claims Are Not Time-Barred ................................................44

A.      The  Continuing Violation Doctrine Applies ........................................45

B.      Plaintiffs Were Not on Notice ................................................................46

C.      Plaintiffs Were Not on Notice Until NYCHA Sued Them ....................47

CONCLUSION.................................................................................................48

TABLE OF AUTHORITIES

Cases

*Allen v. Wright*, 468 U.S. 737 (1984) ......................................................................24

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023)................................................42

*Aschcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................21

*Broome v. Biondi*, 17 F. Supp. 2d 211 (S.D.N.Y. 1997) ..............................................

*Comm'r v. S. Texas Lumber Co.*, 333 U.S. 496 (1948) ..............................................29

*Fawcus Machine Co. v. United States*, 282 U.S. 375 (1931) ...................................29

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627
    (1999)...............................................................................................................36

*Frank v. Aaronson*, 120 F.3d 10 (2d Cir. 1997). ....................................................29

*Garcia v. Doe*, 779 F.3d 84 (2d Cir. 2015)..............................................................33

*Garcia v. S.U.N.Y. Health Sciences Center*, 280 F.3d 98 (2d Cir. 2001)................35

*Gilead Cmty. Servs. v. Town of Cromwell*, 112 F.4th 93 (2d Cir. 2024).................41

*Goonewardena v. New York*, 475 F. Supp. 2d 310 (S.D.N.Y. 2007) .........................

*Gorman v. Rensselaer Cty.*, 910 F.3d 40 (2d Cir. 2018) .........................................33

*Heckler v. Mathews*, 465 U.S. 728 (1984)............................................................, 40

*Jackson-Bey v. Hanslmaier*, 115 F.3d 1091 (2d Cir. 1997). ..................................41

*Larson v. Valente*, 456 U.S. 228 (1982) ................................................................38

*Lee Ave. Tenants Association by Sanchez v. Steinmetz*, 330 F.Supp.3d 778 (E.D.N.Y. 2018) ...................................................................................46

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40 (2d Cir. 2017) ...................................................................................40

*Monroe v. Pape*, 365 U.S. 167 (1961) ...................................................26

*National Railroad Passenger Corporation. v. Morgan*, 536 U.S. 101 (2002)........45

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .........................................43

*Ossegai v. Bloomfield Bd. of Ed.*, 165 Fed. Appx. 932 (2d Cir. 2006) ...................47

*Petrosky v. New York State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39 (N.D.N.Y. 1999)....................................................................................

*Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898 (2d Cir. 1993)...................22

*Ralia v. United States*, 355 F.3d 118 (2d Cir. 2004) ................................21

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)............................

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................ 25, 39

*Steele v. Title Realty Co.*, 478 F.2d 380 (10th Cir. 1973).............................

*Tellier v. Fields*, 280 F.3d 69 (2d Cir. 2000) ............................................33

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ....................................33

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015)....................................................................................

*Vincent v. Yelich*, 718 F.3d 157 (2d. Cir. 2013) .....................................28

Statutes

42 U.S.C. § 2000d...................................................................... 1, 9, 16, 31

42 U.S.C. § 2000d–7(b) .....................................................................

42 U.S.C. § 3601 ................................................................... 1, 9, 16

42 U.S.C. § 3604(c) ...............................................................25

42 U.S.C. § 3613(c)(1)...............................................................37

N.Y. Exec. Law § 296................................................................ 1, 9, 16

N.Y. Exec. Law Section 296................................................................

Other Authorities

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* No. 98–149

(June 23, 1999), https://www.law.cornell.edu/supct/html/98-149.ZO.html ........35

PRELIMINARY STATEMENT

Plaintiffs Wanda Baez, Siide Gil-Frederick, Danielle Johsnon (collectively, "Individual Plaintiffs"), and Residents to Preserve Public Housing ("RPPH") appeal the District Court's dismissal of their class action complaint alleging discrimination in the distribution of federal rental assistance funds by New York government agencies and officials and the miscalculation of rent under federal regulations.

Commissioner Barbara C. Guinn and the Office of Temporary Disability Assistance (collectively, "State Defendants") and the New York City Housing Authority ("NYCHA") discriminated against Black and Hispanic or Latino public and subsidized housing tenants in violation of the Fair Housing Act ("FHA"), as amended, 42 U.S.C. §§ 3601 et seq.; Title VI of the Civil Rights Act of 1964 ("Title VI"), as amended, 42 U.S.C. §§ 2000d et seq.; and New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. Defendants also discriminated against tenants in public and subsidized housing based on their source of income in violation of New York State Human Rights Law, N.Y. Exec. Law § 296.

Defendant Office of Temporary Disability Assistance ("OTDA") engaged in a pattern or practice of discrimination in the terms, conditions, or privileges of rental of a dwelling and the publication of a notice, statement, or advertisement with respect to rental of a dwelling that indicates discrimination on the basis of race and/or national origin in violation of the FHA and Title VI.

1

Defendant Barbara C. Guinn ("Commissioner Guinn") engaged in a pattern or practice of intentional discrimination in the terms, conditions, or privileges of rental of a dwelling and in the publication of a notice, statement, or advertisement on the basis of race and/or national origin in violation of the FHA, Title VI and Section 1983 and on the basis of source of income in violation of the New York State Human Rights Law.

Defendant NYCHA engaged in negligent practices that breached its duty to residents pursuant to federal regulation and caused them injury. NYCHA also engaged in a pattern or practice of discrimination in the terms, conditions, or privileges of rental of a dwelling and made housing unavailable on the basis of race, national origin and/or disability in violation of the FHA, Title VI and the New York State Human Rights Law.

Plaintiffs seek to certify a class of Black and Hispanic or Latino, public housing tenants who experienced economic hardship during the pandemic and accrued rental arrears from March 2020 through the termination of the New York State COVID-19 Emergency Rental Assistance Program ("CERAP"). All of these class members were eligible for assistance through the federal Emergency Rental Assistance Programs ("ERAP"), but they were discouraged from applying, were denied outright and/or their claims were not processed by OTDA because they lived

2

in public housing. Some of these class members were also eligible for retrospective and prospective adjustments of their monthly rent by NYCHA.

In all cases Plaintiffs were harmed by Defendants' discriminatory policies, which were enacted against the class because of their race, national origin, source of income and/or disability. NYCHA is the largest public housing authority in North America. Together, Black and Hispanic or Latino residents make up the vast majority of the population served by NYCHA. Data has shown that Black and Hispanic or Latino New Yorkers, and by implication NYCHA residents, were disproportionately harmed by the COVID-19 pandemic, experiencing higher rates of economic loss and hardship compared to white New Yorkers. As a public housing authority receiving federal funding and subject to federal regulation, NYCHA must consider such hardship when calculating the monthly portion of rent owed by residents. This amount generally cannot exceed 30 percent of a household's income.

New York State was a pass-through for federal funding allocated from the federal government to local entities, in this case, New York County. New York County's funds were intended to help renters experiencing hardship due to the pandemic. New York State directed OTDA to "implement and operate" ERAP, which included noticing the public of program rules, approving ERAP applications, and administering the funds accordingly, for any participating local jurisdictions. In their administration of ERAP, Defendants Commissioner Guinn and OTDA

3

categorically deprioritized public housing tenants and recipients of government-funded housing subsidies from receiving funding made available to similarly situated households in private, non-subsidized housing. In doing so, Defendants Commissioner Guinn and OTDA rendered one of New York City's most vulnerable populations ineligible to receive ERAP assistance, until all other eligible populations had received assistance. Foreseeably, ERAP funding ran out and the program was terminated without subsidized tenants receiving any financial benefit. This constituted an illegal preference.

NYCHA residents who would have been eligible to apply for ERAP were also intentionally discouraged from doing so due to Defendants Guinn and OTDA's numerous published statements prominently advertising their policy of deprioritizing public and subsidized housing applicants. These statements were authorized and overseen by Defendant Guinn. Those NYCHA residents who applied without knowledge of the deprioritization policy were left pending by Defendants Guinn and OTDA for more than two years, if not denied outright. Some NYCHA tenants, including one of the Individual Plaintiffs, remained pending for nearly three years after the application portal opened.

At the time that the ERAP program closed, few, if any, publicly subsidized tenants had received ERAP assistance. It was only then that Defendants Commissioner Guinn and OTDA collaborated on a process to deliver assistance to

4

some public and subsidized NYCHA residents. Even as Defendants Commissioner Guinn and OTDA discouraged NYCHA tenants from applying for ERAP and held any applications that were filed in abeyance, they encouraged those same tenants to apply for loans from OTDA to cover their rent. Compared to ERAP funds that need not be repaid, OTDA loans have to be repaid in most circumstances. Upon information and belief, OTDA offered NYCHA tenants these loans during events held in the buildings and sometimes using NYCHA and New York City employees. As of April 2024, only approximately 15,000 NYCHA families had been approved for ERAP assistance, out of the more than 58,000 who applied, and despite there being approximately 73,000 families who have fallen behind on rent during and following the pandemic.

Defendant NYCHA, despite being made aware of some residents' financial hardship via Plaintiffs' written, verbal, and in-person requests for Interim recertification, failed to timely recertify their incomes and recalculate monthly rent payments to reflect this hardship. Defendant NYCHA also failed to engage in timely Annual recertifications. This meant that NYCHA residents were charged rent payments amounting to more than 30 percent of their income for extended periods of time. Even once Defendant NYCHA began processing both Interim and Annual recertifications, it failed to calculate the rent retroactively as provided for under federal regulations. Defendant NYCHA, as part of its discriminatory practices and

5

policies, has subsequently initiated a series of consumer debt actions against former NYCHA residents, including two individual Plaintiffs, for the unpaid, though miscalculated, rent.

Defendants engaged in a pattern or practice of intentional discrimination, which disparately impacted Black and Hispanic or Latino, and/or disabled NYCHA residents.

Despite the discrimination Plaintiffs suffered at the hands of Defendants, the District Court dismissed all claims. That decision was erroneous.

First, the District Court improperly dismissed the claims against Commissioner Guinn and OTDA based on sovereign and qualified immunity, respectively. Commissioner Guinn should not have sovereign immunity because she was not enforcing a presumptively valid statute; she was implementing CERAP, a policy that contravenes clearly established antidiscrimination law and thus does not support qualified immunity. Additionally, OTDA is not immune from Title VI and FHA claims.

Second, the District Court wrongly found the Plaintiffs lacked standing to bring these claims. Individual Plaintiffs, including Ms. Gil-Frederick, Ms. Baez, and Ms. Johnson, have standing because their alleged emotional and psychological harms are concrete injuries traceable to the challenged policy and redressable by the

6

relief sought. Contrary to the District Court's erroneous finding, Plaintiffs were not required to apply for ERAP benefits before bringing a discrimination challenge because it was a futile remedy. Plaintiff RPPH also has standing because the District Court adopted an overly strict standard in construing how much interference to an organization's activities is required before granting RPPH the standing.

Lastly, the District Court erred in holding that the statute of limitations bars Plaintiffs from challenging NYCHA's discriminatory refusal to recertify their income. At minimum, NYCHA's failures to conduct recertifications within the past two years caused ongoing harm and are actionable. Moreover, the continuing violation doctrine applies because NYCHA's repeated failures to recertify were not discrete acts, but part of an ongoing pattern of discrimination. Accordingly, Plaintiffs may also seek relief for injuries stemming from the continuous violations that occurred more than two years ago.

<u>JURISDICTIONAL STATEMENT</u>

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under federal statutes the Fair Housing Act and Title VI, and supplemental jurisdiction over related claims under the New York State Human Rights Law, N.Y. Exec. Law § 296 pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291

7

because the District Court entered judgment dismissing the action on March 28, 2025, and Plaintiffs-Appellants filed a timely notice of appeal on April 28, 2025.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether Plaintiffs' injuries are traceable to Defendant Office of Temporary and Disability Assistance (OTDA) such that they have Article III standing.

2. Whether Defendant Commissioner Guinn had qualified immunity, including with regard to the Title VI claim that the District Court ignores, when a reasonable official would have understood her actions as discriminatory.

3. Whether Defendant OTDA has sovereign immunity under the Title VI claim that the District Court ignores.

4. Whether the Individual Plaintiffs have Article III standing against Defendant NYCHA.

5. Whether Residents to Preserve Public Housing has associational or organizational Article III standing to bring claims.

6. Whether the continuing violations doctrine is applicable on the issue of the Fair Housing Act's statute of limitations as it applies to NYCHA's income recertification.

## STATEMENT OF THE CASE

8

Plaintiffs-Appellants initiated this action to remedy race and national origin discrimination, both by intent and disparate impact, against Black and Hispanic or Latino public and subsidized housing tenants in violation of the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 et seq.; Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d et seq.; and New York State Human Rights Law, N.Y. Exec. Law § 296. Furthermore, the complaint also sought to remedy source of income discrimination in violation of NYSHRL, N.Y. Exec. Law § 296. On March 28, 2025, the District Court granted the Defendants' motion to dismiss the lawsuit in its entirety. *See* Op. & Order, *Baez et al. v. N.Y. State Off. of Temp. & Disability Assistance et al.*, No. 24-cv-3282 (ER), 2025 WL 950680 (S.D.N.Y. Mar. 28, 2025)[1] Plaintiffs-Appellants timely appealed.

## I.    Factual Background

### A.    NYCHA Residents and the COVID-19 Pandemic

New York City Housing Authority is the largest public housing authority in North America. Amend. Compl. ¶ 6. Together, Black and Hispanic or Latino tenants make up the majority of the population served by NYCHA. *Id*. ¶ 7. As a public housing authority receiving federal funding and subject to federal regulation, NYCHA must consider hardship when calculating the monthly portion of rent owed

---

[1] References to the Joint Appendix are designated "JA-__." The Opinion & Order, at JA-519 to 538, is referenced as "Op. & Order". The Amended Complaint, at JA-199 to , is referenced as "Amend. Compl.".

by residents. *Id*. Generally, this amount cannot exceed 30 percent of a household's income. *Id*.

Throughout the COVID-19 pandemic, data showed that Black and Hispanic or Latino New Yorkers, and by implication NYCHA residents, were disproportionately harmed by the COVID-19 pandemic, experiencing higher rates of illness, economic loss, and other hardships compared to white New Yorkers. *Id*. To help quell the ongoing harm, New York State received federal funding under the Emergency Rental Assistance Program to implement, at its own discretion, the New York State COVID-19 Emergency Rental Assistance Program, a state-administered program established to provide financial aid to low-and moderate-income households for rent and utility arrears accumulated due to the pandemic. *Id*. ¶ 46. The U.S. Department of Treasury ("the Treasury Department") guidelines made it clear that the federal government's goal was to assist all tenants that qualified, including NYCHA residents. *Id*. ¶ 43. New York State assigned OTDA responsibility for approving ERAP applications and administering the funds accordingly. *Id*. ¶ 24.

**B.** **Discriminatory Distribution of Federal Emergency Rental Assistance in New York City.**

OTDA unlawfully administered ERAP funds in a way that "deprioritized" public housing residents and recipients of federally funded ongoing rental assistance.

*Id.* ¶ 10. In doing so, OTDA rendered one of New York City's most vulnerable groups ineligible to receive assistance until all other eligible populations had received assistance, contrary to the Treasury Department's very purpose of creating the assistance program. *Id.*

NYCHA residents who would have been eligible to apply for ERAP were intentionally discouraged from applying when Defendant OTDA prominently published its policy of deprioritizing public and subsidized housing tenants. *Id.* ¶ 11. NYCHA residents who did apply for ERAP, despite the discriminatory policy, were left pending by Defendant OTDA for years, if not denied outright. *Id.* Some applications remained pending nearly three years after the application portal opened. *Id.*

As of April 2024, out of 39,000 NYCHA families who had applied for ERAP, 15,000 were approved for assistance. *Id.* ¶ 14. NYCHA had reported 73,000 families had fallen behind on rent during and following the pandemic. *Id.*

Additionally, despite being aware of residents' financial hardship via a portal where NYCHA requested tenants notify them of filing an ERAP application as well as an influx of requests for recertification, NYCHA failed to do annual recertifications during the COVID-19 pandemic. This practice was especially problematic given that NYCHA knew about the loss of income for some of the

tenants that had applied for ERAP. *Id.* ¶15. This failure, over the course of years, resulted in thousands of NYCHA residents being charged rent in excess of the 30 percent of their income allowable by law. *Id.*

Defendants' policies and practices were a direct result of their own intentional discrimination against members of a protected class: Black and Hispanic or Latino subsidized tenants in New York City. Their policies and practices also had a disparate impact on Black and Hispanic and Latino subsidized tenants in New York City. Because Black and Hispanic and Latino individuals comprise approximately 89% of NYCHA's population, discrimination against NYCHA residents is *de facto* discrimination against Black and Latino individuals. *Id.* ¶ 70. Defendants' practices and policies disproportionately caused Plaintiffs and others similarly situated to fall behind on rent, resulting in prolonged financial strain and emotional hardship stemming from both the economic burden. In addition, Plaintiffs were harmed by the experience of discrimination itself. *Id.* Those in the putative class action also had consumer debt proceedings brought against them and their families. NYCHA initiated consumer debt actions against former NYCHA residents for unpaid rent that it knowingly miscalculated. *Id.* ¶ 16. NYCHA filed evictions against current NYCHA residents who owe the highest dollar amounts and did not apply for ERAP. Defendant NYCHA is therefore seeking to evict families and recover millions of

12

dollars in miscalculated rental arrears, which ERAP assistance could have covered if not for Defendants' discriminatory administration of the program. *Id.*

### C. Plaintiff-Appellants' Causes of Action and Defendant-Appellees' Unlawful Conduct

Plaintiff-Appellant Ms. Wanda Baez previously resided in Defendant NYCHA-managed housing at the Throggs Neck Houses at 2773 Dewey Avenue, Apt #1A, Bronx, New York. *Id.* ¶ 20. Ms. Baez experienced financial hardship during the pandemic that would have made her eligible for ERAP. *Id.* However, when she applied in August 2021, despite not realizing it, under New York State law she was ineligible because her rent was subsidized. *Id.* Because of Defendants' discriminatory policies, Ms. Baez was unable to benefit from ERAP during the height of the COVID-19 pandemic. *Id.* Defendant NYCHA also failed to recertify Ms. Baez's income despite having notice of her financial hardship. *Id.* Due in large part, Ms. Baez accrued over $46,000 in rental arrears between 2020 and 2022. *Id.* Defendant NYCHA subsequently filed a consumer debt action against Ms. Baez for the unpaid, miscalculated amount of rent. *Id.* That case remains pending. *Id.*

Plaintiff-Appellant Ms. Siide Gil-Frederick resides at Defendant NYCHA-managed Jacob Riis Houses at 118 Avenue D, New York, NY 10009. *Id.* ¶ 21. Ms. Gil-Frederick experienced financial hardship during the pandemic. *Id.* Under federal guidelines, Ms. Gil-Frederick should have been eligible for ERAP; however, under

13

CERAP, the New York State law, she was ineligible for emergency rental assistance due to being subsidized when she applied. *Id.* Not realizing she was ineligible, Ms. Gil-Frederick applied for ERAP in June 2021. *Id.* Her application remained pending for more than two years until November 13, 2023. *Id.* Because of Defendants' discriminatory policies, Ms. Gil-Frederick was unable to benefit from ERAP during the height of the COVID-19 pandemic. *Id.* The repercussions of this included Ms. Gil-Frederick accrued more than $25,000 in rent arrears since 2020 and is at risk of being evicted. *Id.*

Plaintiff-Appellant Ms. Danielle Johnson previously resided at Defendant NYCHA managed Astoria Houses, at 4-24 Astoria Blvd., Apt. #3F, Astoria, Queens, New York. *Id.* ¶ 22. Ms. Johnson faced financial hardship during the pandemic. *Id.* Despite meeting the eligibility requirements for ERAP, Ms. Johnson never received information about ERAP, and as such, never had the opportunity to apply. *Id.* Because of Defendants' discriminatory policies, Ms. Johnson was unable to benefit from ERAP during the height of the pandemic. *Id.* She then faced more than $28,000 in rental arrears between 2020 and 2021. *Id.* Defendant NYCHA subsequently filed a consumer debt action against Ms. Johnson to recover the unpaid rent, a case that is still pending. *Id.*

Plaintiff-Appellant Residents to Preserve Public Housing is a collective organization of tenants who reside in New York City public housing. *Id.* ¶ 23. RPPH

is an advocacy and membership group for public housing residents that organizes its members to participate in policy relating to public housing decision-making in the City centered on preserving public housing. *Id.* Because of Defendants' discriminatory policies, including the failure to provide ERAP to RPPH's individual members when experiencing financial hardship, RPPH's efforts to preserve access to public housing were frustrated. *Id.*

Defendant-Appellee Office of Temporary and Disability Assistance is a government agency duly organized and existing under the laws of the State of New York, with its principal office located at 40 North Pearl Street, Albany, New York. *Id.* ¶ 24. OTDA is a New York State agency that New York State entrusted to administer CERAP and determining individual eligibility. *Id.*

Defendant Barbara C. Guinn is Commissioner of the OTDA. *Id.* ¶ 25. Ms. Guinn was Executive Deputy Commissioner from March 2017 through July 2023, specifically through the COVID-19 pandemic. *Id.* Ms. Guinn "led the agency through the COVID-19 pandemic, helping it implement many new assistance programs and delivering more than $18 billion in additional benefits to help New Yorkers navigate the financial impacts of the public health crisis." *Id.* Ms. Guinn "co-managed the operations of [OTDA] including those related to the administration of the State's COVID-19 Emergency Rental Assistance Program." *Id.* Ms. Guinn

15

was acting under the color of state law when she implemented the ERAP policies.
*Id.*

Defendant-Appellee New York City Housing Authority is a municipal housing agency duly organized and existing under laws of the State of New York, with its principal office located at 90 Church Street, New York, New York. *Id.* ¶ 26. NYCHA is the Public Housing Authority in New York City. *Id.*

## II.     Procedural History

### A.     The Complaint and Motion for Class Certification

Plaintiffs-Appellants initiated this action to remedy race and national origin discrimination, both by intent and impact, against Black and Hispanic or Latino public and subsidized housing tenants in violation of the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 et seq.; Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d et seq.; and New York State Human Rights Law, N.Y. Exec. Law § 296. Furthermore, the complaint also sought to remedy source of income discrimination in violation of NYSHRL, N.Y. Exec. Law § 296.

Plaintiffs seek to certify a class of Black and Hispanic or Latino NYCHA residents who experienced economic hardship during the pandemic and accrued rental arrears from March 2020 onward. These class members were eligible for assistance through the federal ERAP funds and for review and adjustment of their monthly rent, but they were not eligible for assistance under CERAP because of

16

OTDA's discriminatory policy. These class members were therefore harmed by Defendants who discriminated against the class through their policies because of the class's race, national origin, and/or source of income.

### B.    The District Court's Dismissal of the Action

District Judge Ramos granted Defendants' motions to dismiss. Op. & Order at 1. Regarding State Defendants OTDA and former Commission Guinn, the Court found that Plaintiffs lacked Article III standing because their injuries were not traceable to State Defendants' actions. *Id.* at 7. Additionally, the District Court found that Commissioner Guinn, former OTDA commissioner, is entitled to qualified immunity because a "a reasonable official would not have understood their actions to be discriminatory." *Id*. at 9. The Court similarly found that claims under NYSHRL and the FHA against OTDA are barred by sovereign immunity. *Id.* at 10–11.

The District Court held that Plaintiffs lacked Article III standing against NYCHA. *Id.* at 11–14. The Court found that since "it is only speculative that a favorable decision by the court will redress their purported injury," Individual Plaintiffs do not have standing nor a risk of future harm. *Id.* at 12. Regarding RPPH, the Court found the "connection between income recertification and RPPH's core mission . . . is tenuous." *Id.* at 13–14. The Court further held that Plaintiffs' claims against NYCHA were filed outside the statute of limitations. *Id.* at 17.

### SUMMARY OF ARGUMENT

17

Commissioner Guinn is not entitled to qualified immunity because she was not enforcing a presumptively valid statute. By deprioritizing tenants of public or subsidized housing, she violated clearly established federal and state laws that prohibit discrimination. Commissioner Guinn's decision violated the FHA because her decision to deprioritize the tenants of public and subsidized housing constituted intentional discrimination and because her actions disparately impacted Black and Hispanic or Latino community members. Guinn also violated Title VI, which prohibits discrimination based on race and national origin under any program receiving federal financial assistance. Lastly, Guinn violated NYSHRL, which bans discrimination based on individuals' source of income.

Plaintiffs' Title VI and FHA claims against OTDA are also not barred. The District Court dismissed all claims, including the Title VI claim against OTDA, without specifying the exact reason, but Congress has abrogated states' sovereign immunity for violations of Title VI and the FHA through Section 504 of the Rehabilitation Act ("Section 504"). The District Court's interpretation of Section 504 is incorrect.

The harm done to Plaintiffs is directly traceable to OTDA and Commissioner Guinn. The District Court failed to consider all the relevant harm caused by OTDA and Commissioner Guinn and instead focused on late-paid ERAP payments and

18

NYCHA's failure to recertify tenants' incomes. Some tenants were denied outright and never received ERAP payments. Moreover, OTDA and Commissioner Guinn directly harmed Plaintiffs by publishing statements expressing a preference for members of a non-protected class in their CERAP scheme and then by following through on that deprioritization. The publication of these discriminatory statements violates the FHA and the subsequent deprioritization violates the FHA, Title VI, and NYSHRL for discrimination based on race, national origin, and/or source of income. In addition to the invasion of Plaintiffs' statutory rights, OTDA and Guinn's discrimination directly harmed Plaintiffs by causing them emotional distress.

Plaintiffs Gil-Frederick, Baez, and Johnson have standing because the discriminatory application process itself caused harm. The District Court improperly focused on the fact that Ms. Gil-Frederick and Ms. Baez belatedly received ERAP funding and determined that no remedy was available. This ignores the fact that compensatory monetary damages are available for emotional and psychological harms, and that plaintiffs who are subjected to discriminatory policies have suffered an injury no less concrete because it is not tangible. Further, when the District Court determined that Johnson did not have standing because she did not apply for ERAP funding, it overlooked Second Circuit precedent that a plaintiff may not necessarily have to submit an application to challenge it as discriminatory.

Plaintiff RPPH has standing because the financial hardship and emotional distress its members experienced due to Defendants' discriminatory housing policies, and the resulting financial hardship and stress, made it such that the organization and its members were diverted from their mission of preserving public housing. The District Court made its ruling using an unnecessarily strict standard, as an organization does not need to be completely precluded from conducting activities in order to have standing.

Plaintiffs' discrimination claims stemming from NYCHA's discriminatory failure to recertify their incomes are not circumscribed by the statute of limitations. Because each failure, taken together with a broader discriminatory policy of deliberate non-assistance based on protected status, did not happen discretely, the non-recertification of income is placed well within the terms of the continuing violation doctrine. This means that violations both before and after the term of the statute of limitations will be treated as part of the same, while violative policy and that those prior are not time-barred. The lack of notice requirement for continuing violations is inapplicable here because notice only begins when a layperson would recognize the violative action as such. Due to the inherently drawn-out nature of income recertification and the unique circumstances of the situation, a layperson would not have immediately understood the delay to be discriminatory such that he or she would be on notice within the timeframe of the statute of limitations.

20

In the case that the continuing violation doctrine is inapplicable, the statute of limitations only began tolling when Individual Plaintiffs were sued by NYCHA for rent at the non-recertified rate, with no reason to know of or understand harm that, prior to NYCHA's suit, could have been a mere delay or mistake that could have been corrected.

## STANDARD OF REVIEW

When evaluating a motion to dismiss for lack of subject matter jurisdiction, courts should accept all reasonable factual allegations as true and draw inferences in favor of the plaintiff. *Ralia v. United States*, 355 F.3d 118, 119 (2d Cir. 2004). When evaluating a motion to dismiss for failure to state a claim courts should dismiss the complaint only when no set of facts exists to support the plaintiff's argument. *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, courts should accept factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Id*.

## ARGUMENT

**III.    The Harm Suffered by Plaintiffs is Directly Traceable to OTDA and Commissioner Guinn**

The District Court erred when it found that Plaintiffs' harms were not traceable to OTDA and Commissioner Guinn, and therefore that Plaintiffs' lacked standing as to their claims against them. The District Court failed to consider the full panoply of harms OTDA and Commissioner Guinn caused to Plaintiffs, notably the

21

emotional distress that Plaintiffs experienced from discrimination, including the stigma of being discriminated against itself. For many Plaintiffs, ERAP funds were distributed years after the COVID-19 pandemic and only once this lawsuit had been filed.

### A. OTDA and Commissioner Guinn's Publication of Discriminatory Statements Is a Cognizable Harm Redressable by Law.

Despite the District Court's focus on NYCHA's failure to recertify incomes, Plaintiffs allege a series of other harm, including discriminatory statements made by OTDA and Commissioner Guinn. The publication of statements expressing a preference for a member of non-protected class is a violation of the FHA. 42 U.S.C. § 3604(c); *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 904 (2d Cir. 1993) (quoting *Ragin v. Harry Macklowe Real Est. Co.*, 801 F. Supp. 1213, 1228 (S.D.N.Y. 1992)); *see* Amend. Compl. ¶ 124, 187. Between February 2022 and May 2023, OTDA and Commissioner Guinn published statements on OTDA's website deprioritizing subsidized tenants included a policy expressing a preference for a non-protected class, one version of which read:

> Applications from subsidized housing tenants whose rent is limited to a certain percentage of income (including public housing and Section 8) cannot be paid. The State Law requires that these applicants are only paid after all other eligible applicants have been paid. At this time, none of the subsidized housing applications can be paid regardless of the date their application was submitted. Amend. Compl. ¶ 99–101.

The statement was updated and republished at least two more times with the same deprioritization language, once on or around May 4, 2022 to add FHEPS

22

recipients within the list of deprioritized tenants, and again on or around January 12, 2023 to announce that the ERAP application portal would close January 20, 2023. Amend. Compl. ¶ 100–101.

This policy expressly discriminated against public housing tenants by denying them access to a government benefit in real time and by requiring that they wait at the back of the line until every member of a non-protected class was serviced. What is more, OTDA and Commissioner Guinn knew or should have known that public housing tenants living in New York City are disproportionately members of a protected class: Black and Latino. Amend. Compl. ¶ 124, 187, 205. Because status as a subsidized tenants in New York City is a proxy for being a Black or Latino person, discrimination against subsidized tenants is discrimination based on race and national origin. *Id*. And, thus, the publication of New York's discriminatory policy on OTDA's website was itself a violation of federal law. 42 U.S.C. 3604(c). The Supreme Court has repeatedly emphasized that "discrimination itself . . . can cause serious non-economic injuries who are personally denied equal treatment solely because of their membership in a disfavored group" as a result of perpetuating negative stereotypes and stigmatizing members of the group. *Heckler v. Mathews*, 465 U.S. 728, 739–740 (1984) (internal citations omitted). Stigmatization "is one of the most serious consequences of discriminatory government action" and can accord standing to those who are "personally denied equal treatment by the challenged

23

conduct[.]" *Allen v. Wright*, 468 U.S. 737, 755 (1984) (internal quotation marks and citations omitted). Moreover, OTDA and Commissioner Guinn's invasion of rights guaranteed by statute in the FHA is enough to constitute an injury for the purposes of standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing'") (internal citations omitted). Because they, too, know that subsidized tenants in New York City are disproportionately Black and Latino or Hispanic, Plaintiffs suffered the stigma of knowing that their status as poor people of color in New York City prevented them from receiving needed rental assistance under the CERAP scheme. This injury flows directly from OTDA and Commissioner Guinn's both publishing discriminatory statements and actually executing of their discriminatory scheme and so is traceable to the OTDA and Commissioner Guinn.

Moreover, a person who experiences the discriminatory nature of such an advertisement "has suffered injury in precisely the form the [FHA] was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Id*. OTDA and Commissioner Guinn's publication of these statements violates the FHA by indicating preference, limitation, or discrimination based on race, color, national origin, and/or disability because the group *intended* to be deprioritized, and thereby limited and discriminated against, by these statements

24

is predominantly composed of Black and Hispanic or Latino persons. *See*, 42 U.S.C. § 3604(c). The harmful nature of this type of preferential policy has been recognized since Rosa Parks was denied a seat on a Montgomery bus.

### B. OTDA and Commissioner Guinn's Delay in Distributing ERAP Funds Caused Emotional Distress to Plaintiffs.

Emotional distress is the kind of "real, and not abstract" injury in fact that accords Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). The emotional harm suffered by the Plaintiffs is traceable to the OTDA and Commissioner Guinn because the deprioritization and delay of the Plaintiff's ERAP funding resulted directly from the scheme developed by the OTDA under Commissioner Guinn. Plaintiffs first applied for ERAP during the height of the COVID-19 pandemic and were either denied or left "pending" for years. The District Court made no mention of those tenants that were denied simply for being members of a protected class prior to this lawsuit being filed and would never receive ERAP funds. Even for those who did, however, the period between when they filed their applications and payment was rife with financial uncertainty and fear. This was one of the most financially vulnerable populations in New York City during the pandemic and the denial and uncertainty about whether this needed financial assistance would ever come caused emotional distress, which the District Court failed to recognize. Amend. Compl. ¶ 10.

25

**IV.** **The District Court Erred in Finding that Commissioner Guinn Enjoyed Qualified Immunity**

    **A.** **Commissioner Guinn Is Not Entitled to Qualified Immunity Because Acting Under State Law Does Not Exempt an Official from Responsibility for Discrimination.**

OTDA and Commissioner Guinn argue that Plaintiffs have no standing as to Guinn because she was acting under state law in the implementation of CERAP, but acting under state law or the "color of state law" does not shield officials from responsibility for discrimination. Indeed, Title VI and the FHA aim particularly at discrimination implemented by government actors under state laws. *Monroe v. Pape*, 365 U.S. 167, 171–72 (1961) ("Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it."); *see, e.g., Tex. Dep't of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539)(2015) ("The FHA . . . was enacted to eradicate discriminatory practices within a sector of our Nation's economy."); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 284 (1978) ("Examination of the voluminous legislative history of Title VI reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination . . ."). It is therefore not enough that Commissioner Guinn was acting in the context of state law, or else the protections of the FHA and Title VI would be meaningless against discrimination by state actors.

26

**B.      Commissioner Guinn Is Not Entitled to Qualified Immunity Because She Was Not Enforcing a Presumptively Valid Statute by Violating Clearly Established Antidiscrimination Laws.**

In finding that Commissioner Guinn is entitled to qualified immunity, the District Court reasoned that deprioritizing tenants in public and subsidized housing does not violate a clearly established right and Guinn was merely implementing a presumptively valid statute. Op. & Order at 13-14. Guinn was implementing CERAP, which was enacted when New York received federal funding under the Consolidated Appropriations Act, 2021 ("ERA1") and the American Rescue Plan Act of 2021 ("ERA2"). *Id*. The District Court characterizes CERAP as a presumptively valid statute. *Id*. at 14.

However, the District Court's argument is flawed because the Treasury Department placed Guinn on notice of her obligations to comply with federal antidiscrimination laws in her implementation of the program. Although state officials are presumed to act lawfully when enforcing a presumably valid statute, the presumption does not apply when the state officials' actions are not objectively reasonable or when the statute has been invalidated by a binding court decision. *See Connecticut ex rel. Blumenthal*, 346 F.3d 84, 102 (2d Cir. 2002) ("absent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful"); *but see Vincent v. Yelich*, 718 F.3d 157, 35-44 (2d Cir. 2013) (holding

27

that the state commissioner was not shielded by qualified immunity and ordered discovery to evaluate whether, after learning that the conditions violated federal law, he took objectively reasonable steps to lift unlawful burdens).

To avoid any confusion on this point, the Treasury Department put states on notice of their obligation to comply with clearly established antidiscrimination laws when administering ERAP funding. The Treasury Department specifically stated:

> [G]rantees are required to comply with the Fair Housing Act, which prohibits discrimination in housing because of race, color, national origin . . . With respect to ERA2, grantees must not refuse to provide assistance to households *on the basis that they occupy such [subsidized] properties or receive such assistance*, due to the disproportionate effect such a refusal could have on populations intended to receive assistance under the ERA and the potential for such a practice to violate applicable law, including Title VI, Section 504, and the Fair Housing Act.[2]

The Treasury Department's statement clarifies that New York as a grantee of the ERAP funds could not refuse to assist tenants in public and subsidized properties based on their source of income, lest they violate Title VI, Section 504, and the FHA.[3] The Treasury Department also emphasizes that New York cannot discriminate against individuals based on race or color in enforcing the statutes of ERA1 and ERA2.[4]

---

[2] *Emergency Rental Assistance Program: FAQs*, U.S. Department of the Treasury (last updated July 6, 2022), https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/emergency rental-assistance-program/faqs#15 (emphasis added).
[3] *Id*.
[4] *Id*.

Here, Commissioner Guinn's effective prohibition on tenants of public and subsidized housing from receiving ERAP funds for an extended period directly contravenes the Treasury's guidance on distributing ERAP funds, defeating any claim to qualified immunity. *See Comm'r v. S. Texas Lumber Co.*, 333 U.S. 496, 501 (1948) ("Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes . . ."). *See also, Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931); *Frank v. Aaronson*, 120 F.3d 10, 15 (2d Cir. 1997).

In addition to the Treasury Department's guidance, binding precedent also prohibits discrimination in housing or government programs based on a protected class, including income source and race or national origin.

For example, NYSHRL expressly prohibits source of income discrimination. Under N.Y. Exec. Law Section 296, "it shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation . . . to discriminate against any person because of race, creed, color, national origin . . . or lawful source of income . . . ."

Commissioner Guinn cannot lawfully treat tenants of public and subsidized housing differently because of their source of income. Commissioner Guinn's

29

implementation of CERAP to deprioritize tenants of public and subsidized housing in ERAP assistance should not be presumed lawful because CERAP is not a presumptively valid statute. Instead, CERAP is facially discriminatory and unlawful because it directs and authorizes Guinn to deprioritize tenants in public and subsidized housing. Amend. Compl. ¶ 11. Commissioner Guinn's implementation of CERAP therefore directly contravenes her obligations to comply with the established antidiscrimination laws that prohibit discrimination based on race, national origin and source of income, per the Treasury FAQ.[5]

Deprioritizing New York City's public and subsidized housing tenants also constituted unlawful racial discrimination under both FHA and Title VI. Under FHA, intentional discrimination against a protected class, including race and national origin, is strictly prohibited. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). FHA also prohibits government actions that produce discriminatory effects absent discriminatory intent. *See Tex. Dep't of Hous. & Cmty. Affairs* at 524, 545 (2015) (holding that disparate-impact claims challenging practices that have a "disproportionately adverse effect on minorities" are cognizable under FHA). Likewise, under Title VI, "no person shall, on the grounds of race,

---

[5] *Id.*

30

color, or national origin . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. 2000d.

Here, the facts before the District Court demonstrated that Commissioner Guinn intentionally discriminated against Black and Hispanic or Latino tenants in New York's public and subsidized housing when she published statements expressing a preference for members of a non-protected class and then provided financial benefits on different terms to those tenants, preventing or delaying them from receiving ERAP funding. Amend. Compl. ¶ 11–13. Commissioner Guinn's acts of intentional racial discrimination were unlawful under both the FHA and Title VI.

The violation of these clearly established laws, including NYSHRL, FHA, and Title VI, precludes Guinn from claiming qualified immunity.

When evaluating whether Plaintiffs' rights at issue were clearly established such that they would preclude Commissioner Guinn from claiming qualified immunity, the District Court defines the right at issue narrowly. "Because no Supreme Court or Second Circuit precedent exists that clearly establishes that an 'emergency program, enacted during an unprecedented pandemic, would violate antidiscrimination law by deprioritizing subsidized tenants,' the Court concludes

31

that a reasonable official would not have understood their actions to be discriminatory." Op. & Order at 9.

Framing the right in this way is overly narrow and inconsistent with Congressional intent. The instant proceeding is fundamentally about whether the the State Defendants violated laws that prohibit discrimination based on race or national origin—rights clearly established under Title VI and the FHA. By defining the rights at issue narrowly as a subsidized tenant's right to be free from discriminations in "emergency program, enacted during an unprecedented pandemic", the District Court effectively permits the government to infringe clearly established rights. *Id.* Moreover, as emergencies become increasingly common—ranging from the COVID-19 pandemic to recent emergency declarations concerning the Southern Border and crimes in Washington, D.C.—the District Court risks allowing governments to sidestep those rights, leaving individuals without legal recourse to challenge potentially unlawful and discriminatory actions. That result is contrary to precedent because courts have long recognized that even during emergencies, governments still may not discriminate based on race or national origin. *See Jew Ho v. Williamson*, 103 F. 10, 24-6 (N.D. Cal. 1900) (holding that the quarantine of an entire community of people of color during a bubonic plague is an unreasonable regulation and discriminatory).

Finally, the fact that well-established laws that prohibit discrimination based on race and national origin foreshadowed the District Court's ruling on this issue in Plaintiffs' favor prevents Guinn from finding cover behind sovereign immunity. S*ee Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) ("If decisions from this or other circuits clearly foreshadow a particular ruling on the issue, the Court may treat the law as clearly established.") *See also Gorman v. Rensselaer Cty*., 910 F.3d 40, 45-6 (2d Cir. 2018); *Garcia v. Doe*, 779 F.3d 84, 92 (2d Cir. 2015); *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000).

## V.  Plaintiffs' Claims Against OTDA Under Title VI and FHA Are Not Barred by Sovereign Immunity

The District Court granted the motion to dismiss all claims against OTDA, finding that the FHA and NYSHRL claims are barred by sovereign immunity. Op. & Order at 10–13.

However, Plaintiffs asserted a separate Title VI claim against OTDA, which the District Court wholly ignores. OTDA does not have sovereign immunity with respect to Plaintiffs' Title VI claims because Congress has abrogated States' sovereign immunity for violations of Title VI that occur in whole or in part after October 21, 1986. 42 U.S.C. § 2000d–7(b). *See Goonewardena v. New York*, 475 F. Supp. 2d 310, 329 (S.D.N.Y. 2007) ("while the acceptance of federal funds by a state

33

entity waives that state's immunity for purposes of Title VI, it does not for purposes of section 1983.")

The District Court also held that Section 504 did not constitute a knowing and voluntary waiver of New York's sovereign immunity against FHA and NYSHRL claims. Op. & Order at 10-11. However, the language of Section 504 suggests that New York waives immunity as it relates to lawsuits in federal courts for violating federal antidiscrimination laws, including Title VI and FHA, by knowingly accepting the federal ERAP funding. Under Section 504 "a state shall not be immune… from suit in Federal court for a violation of Section 504 . . . Title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 29 U.S.C. § 794. Because FHA is a federal statute that prohibits discrimination, accepting the ERA funding also abrogates New York's sovereign immunity against suits under FHA in addition to the explicitly mentioned Title VI claims

The District Court relied on *Garcia v. S.U.N.Y Health Sciences Center* to conclude that Section 504 did not constitute a knowing and voluntary waiver of New York's sovereign immunity against the FHA claim, despite the unambiguous statutory language. 280 F.3d 98, 114 (2d Cir. 2001). *See* Op. & Order at 11. In *Garcia*, the Court of Appeals of the Second Circuit held that a state "accepting conditioned federal funds could not have understood that in doing so it was actually

34

abandoning its sovereign immunity from private damages suit." *Id.* at 113. The Court of Appeals of the Second Circuit reasoned that, although Section 504 clearly expresses Congress's intent to condition federal funds on a state's waiver of Eleventh Amendment immunity, that clarity alone does not establish that New York consented by accepting funds. *Id.* at 113–14.

However, *Garcia* provides a weak foundation for the District Court's view that Section 504 did not constitute a knowing and voluntary waiver of the state's sovereign immunity over federal antidiscrimination laws because *Garcia* relied on language quoted from an unrevised version of the Supreme Court's opinion in *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank.*[6] *See Garcia* 114 ("there is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action [e.g., accepting federal funds] it shall be deemed to have waived that immunity.")

These sentences do not appear in the formal, published version of the opinion and were not included in the preliminary print of the United States Reports. *See generally Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527

---

[6] *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* No. 98–149 (June 23, 1999), https://www.law.cornell.edu/supct/html/98-149.ZO.html (unrevised opinion of the court) ("This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.").

35

U.S. 627 (1999). In fact, the final, revised opinion does not analyze whether a state's acceptance of federal funds constitutes a waiver of the state's sovereign immunity at all; it only addresses whether Congress validly abrogated state sovereign immunity under the Patent Remedy Act, whose statutory language suggests that it broadly abrogated states' sovereign immunity over patent infringement claims regardless of states' acceptance of Federal financial assistance. Under the Patent Remedy Act, "any state . . . shall not be immune . . . from infringement of a patent . . ." *Id*. 632. The Court in *Fla. Prepaid Postsecondary Educ. Expense Bd.* concluded that the abrogation in the Act was "so out of proportion to a supposed remedial or preventive object" that it could not be sustained under the Fourteenth Amendment. *Id*. 646.

Here, the facts of the instant proceeding are distinct from those in *Fla. Prepaid Postsecondary Educ. Expense Bd.* Unlike the statutory language of the Patent Remedy Act, the statutory language of Section 504 constrains the abrogation of states' sovereign immunities where states receive Federal financial assistance. 29 U.S.C. § 794. Therefore, reliance on the unrevised opinion of *Fla. Prepaid Postsecondary Educ. Expense Bd.* is misplaced and weakens the District Court's analysis of the abrogation of OTDA's sovereign immunity. In general, courts should not treat claims grounded in unrevised Supreme Court opinions or claims that involve logical leaps as binding. *See generally, Coleman v. Rick*, 281 F. Supp. 2d 549 (E.D.N.Y 2003) (criticizing a logical leap that the Court of Appeals of the

36

Second Circuit made in interpreting Supreme Court precedent and emphasizing that conclusions unsupported by Supreme Court rulings should not be treated as binding). This interpretation of *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank* cannot override the statutory language in Section 504, which unambiguously abrogates New York's sovereign immunity from suits under FHA and Title VI after it accepts the federal ERAP funding.

## VI. Plaintiffs Have Constitutional Standing Because They Suffered from Concrete and Particularized Injury and Their Requested Relief Is Not Speculative

The Plaintiffs suffered severe emotional distress and financial hardship as a result of NYCHA's persistent failure to recertify household incomes during the COVID-19 pandemic. Amend. Compl. ¶ 89.

The compensatory damages contemplated in FHA account for emotional distress damages and accord standing to Plaintiffs. 42 U.S.C. § 3613(c)(1). As stated above, courts have repeatedly ruled that emotional distress is a redressable harm under the FHA. *See, e.g., Steele v. Title Realty Co.*, 478 F.2d 380, 384 (10th Cir. 1973) ("damages in cases of this kind [FHA] are not limited to out of-pocket losses but may include an award for emotional distress and humiliation").

As stated previously, the failure to recertify tenants' incomes contributed significantly to Plaintiffs' housing insecurity and ensuant emotional distress at the possibility of becoming homeless. This emotional harm caused by NYCHA entitles

Plaintiffs to monetary damages, meaning that the relief they requested from the District Court is not purely speculative.

The District Court characterized Plaintiffs' requested relief as injunctive and declaratory, but the requested relief includes compensatory monetary damages for Defendants' discriminatory conduct. Amend. Compl. at JA-72. It is sufficient for Article III standing that a plaintiff shows a favorable decision will relieve a discrete injury alleged, even if it will not relieve every injury caused by the defendant. *See Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982). Here, the monetary relief sought would compensate for the emotional distress caused by NYCHA's failure to recertify and its subsequent consumer debt actions.

## VII.  Plaintiffs Have Standing Because Each Suffered Concrete Injuries

The District Court found that Individual Plaintiffs lacked standing, because it was speculative whether a favorable decision would redress their purported injury. Op. & Order at 12. As to Ms. Baez and Ms. Gil-Frederick, the District Court focused on the fact that they had already received ERAP funds as evidence they could not claim harm related to the deprivation of benefits. *Id.* The District Court also held that Johnson lacked standing because she did not apply for ERAP funds. *Id.* However, this misinterprets the nature of the harm suffered by the named Plaintiffs.

38

### A. The Individually Named Plaintiffs Were Harmed by the Discriminatory Application Process Itself and Thus Have Standing

The Individual Plaintiffs have standing because the discrimination itself caused a cognizable harm for which they are eligible for monetary damages. The District Court's finding that Plaintiffs "cannot claim harm related to the deprivation of benefits" wholly ignored the facts that: 1) many of the putative class members were denied (simply for being members of a protected class) and did not ever receive benefits and 2) even those putative class members that did ultimately, after years of delay, receive an ERAP payment suffered emotional and psychological harm, which is cognizable under the statutes at issue. *Id.*

In considering whether there was a concrete injury for purposes of determining Article III standing, concrete should not be taken as synonymous with tangible. *Spokeo* at 340. The District Court's discussion of the benefits ultimately received leaves out the intangible injuries Plaintiffs suffered.

The discriminatory treatment experienced by Individual Plaintiffs, namely the stigmatization, delay, and stress associated with being deprioritized and placed at "the back of the line" through the application process due to their race and national origin is a concrete injury for purposes of Article III standing. The Supreme Court has held that:

Discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group. *Heckler* at 739–740.

This Court has interpreted *Heckler* as affirming that "an injury resulting from discrimination could be emotional or psychic, rather than monetary." *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 50 (2d Cir. 2017). The District Court's focus on the calculation of benefits received while ignoring the emotional and psychological harm suffered due to the discriminatory application process was improper.

The District Court's assertion that there are no remedies available for Ms. Baez and Ms. Gil-Frederick because they received delayed ERAP benefits similarly leaves out the compensatory monetary damages that are available to each of them for the significant emotional and psychological harms they experienced. The Southern District of New York has previously upheld compensatory and punitive damages for racial discrimination and emotional distress under 42 U.S.C. sections 1981 and 1982, FHA, and NYSHRL, and recognized that "even a single instance of discrimination can warrant significant emotional distress damage awards." *Broome v. Biondi*, 17 F. Supp. 2d 211, 225 (S.D.N.Y. 1997). This Court has similarly upheld large compensatory and punitive damage awards for violations of the FHA. *See*

*generally Gilead Cmty. Servs. v. Town of Cromwell*, 112 F.4th 93 (2d Cir. 2024).

Given the availability of such damages, the District Court's assertion that Ms. Baez

and Ms. Gil-Frederick were made whole by the relatively small distribution of ERAP

funding, years after it was applied for and would have been most helpful, was

improper.

**B.      Johnson Did Not Need to Apply for ERAP Benefits in Order to Have Standing**

Individual Plaintiff Ms. Johnson has standing despite not applying for ERAP

funding because the harm rests in the fact that she was excluded under the program.

A plaintiff need not submit an application under a discriminatory program in order

to challenge that application if they are explicitly ineligible under OTDA and

Commissioner Guinn's implementation of CERAP.

The District Court found that Ms. Johnson lacked standing because she did

not apply for ERAP funding, citing to *Jackson-Bey v. Hanslmaier*. 115 F.3d 1091,

1096 (2d Cir. 1997). *Jackson-Bey* is not determinative, as a subsequent case decided

by the Court of Appeals of the Second Circuit found that a plaintiff had standing to

challenge a discriminatory application despite not having submitted one themselves.

In *Antonyuk v. Chiumento*, this Court contemplated whether Plaintiffs had

standing when they did not apply for a license for which they would have been

ineligible and found that submitting an application was not a requirement for

41

establishing standing. 89 F.4th 271, 287 (2d Cir. 2023). The *Antonyuk* Court found that a distinction is made when the application *process* is discriminatory, and "when the plaintiff challenges the application itself (or as here, a portion thereof), he is not required to first apply [and be] refused." *Id.* The *Antonyuk* Court clarified that a distinction must be made when the plaintiff is ineligible under the program. *Id.* at 309. Since Ms. Johnson has suffered injury and was not required to apply standing.

## C.     RPPH Has Organizational Standing to Bring Claims.

The District Court ruled that Plaintiff RPPH lacked organizational standing, calling the connection between RPPH's mission and the Plaintiff's claims too attenuated. Op. & Order at 13. In doing so, it misapprehends the rigidity of the standard this Court has set for organizations to establish standing. While correctly relying on *Havens Reality Corporation v. Coleman* for the proposition that an organization may establish standing if a defendant's actions cause a concrete and demonstrable injury to the organization's activities, and consequent drain to the organization's resources, Second Circuit precedent supports the fact that a *diversion from* the organization's core mission is a sufficient injury. *Havens Reality Corporation* at 365.

In *Nnebe v. Daus*, the Court of Appeals of the Second Circuit considered whether New York Taxi Workers Alliance (NYTWA) had standing in a case against New York City Taxi and Limousine Commission's automatic license suspension

42

policy. 644 F.3d 147, 157 (2d Cir. 2011). In that case, the Second Circuit disagreed with the District Court's finding that NYTWA had not provided sufficient evidence to prove that they had been forced to divert resources to assist members affected by the license suspension policy. *Id*. The *Nnebe* Court found that even "scant" evidence was sufficient so long as it was "not abstract," and that "even if only a few suspended drivers are counseled by NYTWA in a year, there is some perceptible opportunity cost expended by the Alliance." *Id.*

Here, the case is stronger than in *Nnebe*; RPPH undoubtedly diverted at least some of its resources to counsel its members, including Ms. Gil-Frederick, about CERAP and its discriminatory policies. This harm should be conceptualized as the lost "opportunity cost" the *Nnebe* Court described. RPPH has been fighting against the NYC Public Housing Preservation Trust ("Trust") and the Permanent Affordability Commitment Together ("PACT") programs, but during the COVID-19 pandemic, the financial and emotional stress its members had to deal with—made worse by both NYCHA's failure to timely recertify household income and the lack of ERAP assistance provided because of Defendant Guinn and OTDA's deprioritization policy—frustrated and diverted them from this mission, to which they were only able to resume once its members financial and housing security situation had stabilized. Amend. Compl. ¶ 48.

43

## VIII.  Plaintiffs' Claims Are Not Time-Barred

The District Court addressed the issue of statute of limitations last, and considered it only as it applied to NYCHA, seemingly because State Defendants' claims were first dismissed for standing. *See* Op. & Order at 15, JA-168-71. It is important to note that although the FHA contains a two-year statute of limitations, 42 U.S.C. § 3613(a)(1)(A), the statute of limitations under Title VI is three years. *Martin v. State Univ. of New York*, 704 F. Supp. 2d 202, 234 (E.D.N.Y. 2010) ("Although Title VI does not contain an express statute of limitations, in New York, such claims falls within the three-year statute of limitations applicable to personal injury causes of action.") (quoting *Al–Haideri v. Trustees of Columbia Univ.*, 2007 WL 2187102, at *2 (S.D.N.Y.2007)). So, even if the District Court's dates are correct as to when Plaintiffs were put on notice, *see* Opp. & Order at 16, JA-170, there is no issue as to Title VI as to at least Wanda Baez's claims. In any event, the District Court's analysis is incorrect that Plaintiffs' FHA claims are time-barred because both NYCHA and the State Defendants took discrete discriminatory action within the applicable time period by failing to conduct required recertifications, publishing new discriminatory statements and policies, and deprioritizing new ERAP applications.

44

A.    **The District Court Erred in Finding the Continuing Violation Doctrine Did Not Apply**

The District Court cites *National Railroad Passenger Corporation. v. Morgan*, suggesting that, per *Morgan*, NYCHA's failure to recertify was too "discrete" to be considered a continuing violation. But NYCHA's acts are not in themselves "discrete" in the same way that *Morgan* describes, such as "termination, failure to promote, denial of transfer, or refusal to hire[.]" 536 U.S. 101, 114, 122 (2002). The act in question here, the policy and practice of deprioritizing public housing residents such that they could not access the program for years, and continuous failure to recertify incomes, did not "occur" at any one time, being better described as a drawn out waiting process with no specific beginning or end. *Id*. at 14. While Ms. Baez and other Plaintiffs have attempted to have their wages recertified, NYCHA did not specifically deny to do so at any bounded, specific moment.

Courts have held that, "[t]he continuing violation doctrine 'extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination.'" *Sundaram v. Brookhaven Nat. Lab'ys*, 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006) (citing *Kulkarni v. City University of New York*, No. 01 CV 3019(DLC), 2001 WL 1415200, at * 3 (S.D.N.Y. Nov.13, 2001)). A wide-ranging failure to recertify incomes on its own may appear to be a systemic error, but such errors seldom exist outside broader policy frameworks. Taken in conjunction with illegally inflated rents as a result of NYCHA's failure to recertify

45

incomes *and* the intentionally discriminatory non-distribution of ERAP funds, NYCHA's rent collection proceedings of arrears could only be the result of a discriminatory policy against those most in need of housing assistance.

### B. The District Court Erred in Finding the Plaintiffs Were on Notice

Lack of notice is an integral part of the continuing violation doctrine and Plaintiffs were not on notice. The District Court cites that continuing violation doctrine does not apply when the plaintiff "[is] on notice of what [he] believed was discrimination but failed to act in preservation of [his] rights in spite of [his] knowledge." *Lee Ave. Tenants Association by Sanchez v. Steinmetz*, 330 F.Supp.3d 778, 792 (E.D.N.Y. 2018). This ruling is not closely related to the case at hand. Plaintiffs could not have been on notice for at least one month and likely longer because they could not have recognized the failure as discrimination and not simple mistake or delay. The initial failure would have taken at least one month to recognize per NYCHA's own policy to reply in one month; even then, further delay could be explained by a slow-moving government, especially during an emergency time. "[Determining the continuing violation doctrine's lack of notice requirement] necessarily involves asking when a layperson, not trained in the law, would have been aware of her right and duty to assert her legal claim." *Petrosky v. New York State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 52 (N.D.N.Y. 1999). A typical renter in these circumstances would not understand, *at or even after the time of*

46

*violation*, NYCHA's failure to recertify incomes as part of a broader discriminatory policy or as a mere ministerial mistake or delay.

### C. Plaintiffs Were Not on Notice Until NYCHA Sued Them

The statute of limitations did not begin to run until Plaintiffs were on notice as a result of NYCHA's suit. "Under federal law, a claim accrues for statute of limitations purposes when the plaintiff knows or has reason to know of the harm." *Ossegai v. Bloomfield Bd. of Ed.*, 165 Fed. Appx. 932, 934 (2d Cir. 2006). Even if the NYCHA's failure to recertify was discrete enough to not be a continuing violation, Plaintiffs still lacked sufficient notice to begin tolling the statute of limitations until they were sued. Plaintiffs may have thought that NYCHA's failure to recertify their incomes was a mere mistake or delay due to exigent circumstances, giving them no particular reason to know of the harm while NYCHA's facilities were stretched thin in the wake of the COVID-19 pandemic. Plaintiffs only learned that there was no intent to correct the mistake when NYCHA sued them—within the FHA's statute of limitations—to collect arrears for rent at the higher, non-recertified rate. It was this event that gave specific reason to Plaintiffs to believe that the failure to recertify was not some small but drawn-out error on the part of NYCHA, but a distinct, cognizable harm. NYCHA took an action in relation to Plaintiffs' incomes without recertification.

47

CONCLUSION

For the foregoing reasons, this Court should vacate the District Court's order granting Defendants' motions to dismiss and remand for further proceedings, including ruling, and ordering supplemental briefing as necessary, on the remaining issues raised in defendants' motions.

Dated:  September 22, 2025       Respectfully Submitted,

New York, New York      s/ Norrinda Brown_____
Norrinda Brown
LINCOLN SQUARE LEGAL
SERVICES
*Attorneys for Appellant-Plainiffs*
150 W 62nd Street, 9th Floor

New York, NY 10022
(212) 636-6934

48

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4)/Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 10,631 words and contains 943 lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2503 in 14-point Times New Roman font.

Dated: September 22, 2025      Respectfully Submitted,
     New York, New York

s/ Norrinda Brown_____
Norrinda Brown
LINCOLN SQUARE LEGAL SERVICES
*Attorneys for Appellant-Plainiffs*
150 W 62nd Street, 9th Floor

New York, NY 10022
(212) 636-6934

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

WANDA BAEZ, SIIDE GIL- FREDERICK,
DANIELLE JOHNSON, and RESIDENTS TO
PRESERVE PUBLIC HOUSING,

                              Plaintiffs-Appellants,

-against-                                         Docket No.  25-1092
                                                    CERTIFICATE OF
NEW YORK STATE OFFICE OF                     SERVICE
TEMPORARY AND DISABILITY
ASSISTANCE, and NEW YORK CITY
HOUSING AUTHORITY and BARBARA C.
GUINN, in her individual capacity,

Defendants-Appellees.

I, Norrinda Brown, hereby certify under penalty of perjury that on September 22,

2025, I served a copy of Appellant's Brief on counsel for the Respondent-Appellee

by the Appellate Case Management System (ACMS).  All counsel in the case are

registered with the ACMS system.

Dated:  September 22, 2025         Respectfully Submitted,
         New York, New York

s/ Norrinda Brown_____
Norrinda Brown
LINCOLN SQUARE LEGAL
SERVICES
*Attorneys for Appellant-Plainiffs*
150 W 62nd Street, 9th Floor

New York, NY 10022
(212) 636-6934